IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| C.R. BARD, INC., a New Jersey corporation, and BARD PERIPHERAL VASCULAR, INC., an Arizona corporation, <br><br> Plaintiffs, <br><br> v. <br><br> SMITHS MEDICAL ASD, INC., a Delaware corporation, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S RENEWED MOTION TO TRANSFER TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE** <br><br> 2:12-cv-00036-RJS-DAO <br><br> Chief District Judge Robert J. Shelby <br><br> Magistrate Judge Daphne A. Oberg |

Plaintiffs C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively, Bard)[1] develop and manufacture medical devices. Bard filed suit claiming Defendant Smiths Medical ASD, Inc. (Smiths) infringed on two of Bard's patents. Smiths denies the allegations. Before the court is Smiths's Renewed Motion to Transfer for Improper Venue.[2] For the reasons explained below, the Motion is GRANTED, and the case is TRANSFERRED to the District of Delaware.

## BACKGROUND

Bard commenced this action on January 11, 2012, alleging Smiths infringed two of Bard's patents related to its power injectable port technology.[3] Bard concurrently filed in this

---

[1] On July 12, 2017, C.R. Bard assigned the patents at issue in this case to Bard Peripheral Vascular, including all causes of action for past, present, and future infringement claims. *See* Dkt. 122 (Motion to Substitute a Party) at 2. C.R. Bard then moved the court to substitute Bard Peripheral Vascular as the named Plaintiff in this case. *Id.* The court denied the Motion and instead ordered joinder of C.R. Bard and Bard Peripheral Vascular. *See* Dkt. 140 (Order Denying Substitution).

[2] Dkt. 204.

[3] Dkt. 2 (Complaint) at 2–4 (U.S. Patent No. 7,947,022; U.S. Patent No. 7,785,302).

court two other actions involving the same patents against Medical Components, Inc. and AngioDynamics, Inc.[4]  While the cases were in initial proceedings, AngioDynamics filed with the United States Patent & Trademark Office (USPTO) a petition for *inter partes* reexamination.[5] After the USPTO granted the petition for review, Smiths successfully moved to stay this case.[6] On December 17, 2012, the case was administratively closed.[7]  Upon completion of the USPTO's *inter partes* reexamination proceedings, the court on October 4, 2019 lifted the stay and reopened the case.[8]

While the case was stayed, the Supreme Court decided *TC Heartland LLC v. Kraft Foods Group Brands LLC*, holding that for venue purposes a corporate defendant in a patent infringement action resides only in its state of incorporation.[9]  That holding significantly changed existing law.[10]  Shortly after this case was reopened, Smiths moved to transfer under the new rule announced in *TC Heartland*.[11]  Smiths argued transfer was required because it is incorporated, and therefore resides, in Delaware, and it does not have a regular and established place of

---

[4] *See* cases 2:12-cv-32 and 2:12-cv-35, respectively.

[5] *See* Dkt. 83 (Motion to Stay) at 2.  AngioDynamics challenged three of Bard's patents involving power injectable port technology, but only two of the patents are at issue in this case.  *See supra* note 3.

[6] *See* Dkt. 89 (Motion for Extension of Stay); Dkt. 97 (Order granting stay).

[7] *See* Dkt. 98.

[8] *See* Dkt. 152.

[9] 137 S. Ct. 1514, 1517 (2017).

[10] *See In re Micron Technology, Inc.*, 875 F.3d 1091, 1094 (Fed. Cir. 2017).

[11] *See* Dkt 157 (Motion to Transfer).

business in Utah.[12]  Challenging that assertion, Bard filed a motion for venue discovery,[13] which the court granted.[14]

Following venue discovery, Smiths filed a Renewed Motion to Transfer for Improper Venue, which is now before the court.[15]  Bard opposes the Motion, arguing venue is proper in the District of Utah because (1) Smiths waived its ability to challenge venue in 2012 when it affirmatively stated in its Answer that venue here was proper and then filed counterclaims against Bard, and (2) the home offices of two Utah-based Smiths sales representatives and a Utah storage unit paid for and used by Smiths sales representatives proves that Smiths had a regular and established place of business in Utah at the time this lawsuit was filed.[16]

The court concludes venue in the District of Utah is improper and GRANTS Smiths's Renewed Motion to Transfer.

## DISCUSSION

"Upon motion by the Defendant challenging venue in a patent case, the Plaintiff bears the burden of establishing proper venue."[17]  Venue is established under 28 U.S.C. § 1400(b), which provides: "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business."  The Supreme Court recently held in *TC Heartland* that in the context of a patent infringement action, a corporate defendant resides only in its state

---

[12] *Id.* at 4.

[13] Dkt. 161.

[14] Dkt. 168 (Order granting venue discovery).

[15] Dkt. 204.

[16] *See* Dkt. 214 (Opposition Memo.) at 1.

[17] *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018).

of incorporation.[18]  Smiths asserts venue is no longer proper in the District of Utah under *TC Heartland* because it is incorporated, and thus resides, in Delaware.  For that reason, Smiths maintains venue here is proper only if Smiths has committed acts of infringement in Utah and had "a regular and established place of business" in the state when the case was filed in 2012.[19]  Smiths denies it had such a place of business.

Bard argues venue is proper in the District of Utah because (1) Smiths waived its right to challenge venue, and (2) Smiths had a regular and established place of business in the District when the case was filed.  The court addresses each argument in turn.

## I.      Smiths Did Not Waive Its Right to Challenge Venue

Bard first argues Smiths waived its right to challenge venue because it admitted in its Answer to the 2012 Complaint that venue here was appropriate, and because it sought affirmative relief here when it chose to assert counterclaims against Bard.  The court disagrees.

### A.  Legal Standard

Patent venue law has changed substantially over the past fifty years, with numerous courts evaluating the relationship between the patent venue statute, § 1400(b), and the general venue statute, 28 U.S.C. § 1391(c).[20]  In 1957, the Supreme Court held the then-existing version of § 1391(c) did not apply to § 1400(b), meaning that patent venue was separate and distinct from general venue requirements.[21]  Following 1988 Congressional amendments to § 1391(c),

---

[18] 137 S.Ct. at 1517.

[19] 28 U.S.C. § 1400(b) (2018).

[20] Section 1391(c)(2), as most recently amended in 2011, states, "[A]n entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction . . . ."

[21] *See Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 229 (1957).

the Federal Circuit concluded in *V.E. Holding Corp. v. Johnson Gas Appliance Co.*[22] that the new § 1391 amendments "furnished a definition of 'resides' that applied to § 1400(b)."[23]  Under the new amendments, a corporate defendant was "deemed to reside in any judicial district in which it [wa]s subject to personal jurisdiction at the time the action [wa]s commenced."[24]  Crucially, the court in *V.E. Holding* broadly expanded patent venue jurisdiction by linking it with the general venue statute.

Because the Federal Circuit retains nationwide original jurisdiction in patent cases,[25] the *V.E. Holding* decision set binding precedent for all federal district courts across the country and remained good law for nearly thirty years.[26]  On May 22, 2017, "the Supreme Court changed the controlling law when it decided *TC Heartland*."[27]  The Court concluded "the [1988 and 2011[28]] amendments to § 1391 did not modify the meaning of § 1400(b)" as interpreted by the Court's

---

[22] 917 F.2d 1574, 1575 (Fed. Cir. 1990).

[23] *In re Micron*, 875 F.3d at 1098.

[24] *Id.* at 1098–99 (internal quotation marks and citations omitted).

[25] *See* 28 U.S.C. § 1295(a)(1) (2018) ("The United State Court of Appeals for the Federal Circuit shall have exclusive jurisdiction of an appeal from a final decision of a district court of the United States . . . in any civil action arising under . . . any Act of Congress relating to patents.")

[26] Federal Circuit law governs on all matters of substantive patent law, while regional circuit law governs procedural issues.  Although venue is a procedural issue, the Federal Circuit explains, "[A] procedural issue that is not itself a substantive patent law issue is nonetheless governed by Federal Circuit law if the issue pertains to patent law, if it bears an essential relationship to matters committed to our exclusive control by statute, or if it clearly implicates the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction." *Laboratory Corp. of America Holdings v. Chiron Corp.*, 384 F.3d 1326, 1330 (Fed. Cir. 2004) (citation omitted).  Therefore, "the interpretation of § 1400(b), a patent-specific statute, including its relation to § 1391, is a matter of Federal Circuit law, not regional circuit law (subject, of course, to Supreme Court law)."  *In re Oath Holdings Inc.*, 908 F.3d 1301, 1305 (Fed. Cir. 2018).

[27] *In re Micron*, 875 F.3d at 1099.

[28] Congress again amended § 1391 in 2011.  The Federal Circuit reasoned the 2011 amendments provided no basis to reconsider its prior decision and reaffirmed *V.E. Holding*.  *See In re TC Heartland LLC*, 821 F.3d 1338, 1343 (Fed. Cir. 2016), *rev'd and remanded sub nom. TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514 (2017) ("We reject Heartland's argument that in 2011 Congress codified the common law regarding venue in patent suits as described in *Fourco*.").

earlier case law.[29]  In contrast to § 1391's default definition, the term "resides" as applied to

patent venue in § 1400(b) "refers only to the State of incorporation" of corporate defendants.[30]

This change, which severed § 1400(b) from § 1391(c), made available an objection to venue

based on lack of residence for defendants nationwide who were currently involved in pending

patent disputes.[31]

Despite this change of law, many district courts initially concluded that defendants

waived their right to challenge venue under Federal Rule of Civil Procedure 12(h)(1) and Rule

12(g)(2) where they previously omitted a venue defense from their answers or initial motions to

dismiss.[32]  The Federal Circuit definitively rejected that approach when it decided *In re Micron*,

explaining, "The venue objection was not available until the Supreme Court decided *TC

Heartland* because, before then, it would have been improper, given controlling precedent, for

the district court to dismiss or to transfer for lack of venue."[33]  In a follow-up case, *In re Oath

Holdings*, the Court again clarified that "issues of waiver or forfeiture of patent-venue rights

under § 1400(b)" are governed by Federal Circuit law and that "*Micron* answers the entire

question of waiver under Rule 12(g)(2) and (h)(1) . . . there [is] no such waiver."[34]

### B.  Analysis

Bard nevertheless claims Smiths waived its right to challenge venue because (1) Smiths

expressly admitted in its Answer to the 2012 Complaint that venue here was proper, and (2)

---

[29] *TC Heartland*, 137 S.Ct. at 1517.

[30] *Id.* at 1521.

[31] *See In re Micron*, 875 F.3d at 1099.

[32] *Id.* at 1093–94.

[33] *Id.* at 1096.

[34] 908 F.3d at 1305.

Smiths submitted to the jurisdiction of the court by filing invalidity and non-infringement counterclaims against Bard.[35]  The Court finds both arguments unpersuasive.

### 1.  Smiths's Admission in 2012 Does Not Amount to Waiver

"Under longstanding precedent, it was understood when defendants answered the complaints filed . . . that venue was proper in a patent infringement case against a corporation in any district in which the corporation was subject to personal jurisdiction."[36]  It is undisputed that venue here was proper based on then-controlling precedent when this case was filed in 2012.  Consequently, Smiths admitted in its Answer that "venue with respect to it is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400."[37]

As previously explained, a venue objection based on Smiths's circumstances pre-*TC Heartland* was not available when the case was filed, and it is well established that a defendant is not required to engage in futile gestures solely to avoid a claim of waiver.[38]  As is the case here, "a sufficiently sharp change of law sometimes is a ground for permitting a party to advance a position that it did not advance earlier in the proceeding when the law at the time was strongly enough against that position."[39]

Bard insists Smiths's specific admission distinguishes this case from other patent cases pending at the time *TC Heartland* was decided.[40]  Unlike Smiths, the defendants in those cases

---

[35] *See* Dkt. 214 (Opposition Memo.) at 21–24.

[36] *Xodus Medical Inc. v. Prime Medical LLC*, 2018 WL 4385243, at *2 (W.D. Pa. Sept 14, 2018) (unpublished).

[37] Dkt. 77 at 3, ¶ 5.

[38] *See In re Micron*, 875 F.3d at 1098 (collecting cases showing all circuits agree with this position).  The Tenth Circuit explains there is no requirement that a defendant "make a futile attempt . . . given the state of the law," and the court will apply a new decision to a pending case when "the decision establishes a new principle of law . . . by overruling clear past precedent upon which the litigants may have relied."  *Peterson v. Shearson/American Exp., Inc.*, 849 F.2d 464, 466 (10th Cir. 1988).

[39] *In re Micron*, 875 F.3d at 1097.

[40] Dkt. 193 (Surreply) at 3.

did not explicitly admit venue was proper.[41]  But this is a distinction without a difference.  Venue here was proper under existing law when this case was filed, and it would have been inconsistent at least with the spirit of the Rules had Smiths maintained otherwise when the defense was clearly unavailable.

The Federal Circuit addressed the same question in *In re Oath Holdings*, where the defendant admitted to venue in its answer, and the court explained that a litigant "cannot be faulted for waiting to present a venue objection until after *TC Heartland* was decided, where the case was in an early stage, [and] the defense could not properly have been adopted by the district court at the time[]."[42]  This was true even when the defendant there was aware that *TC Heartland* was pending and could result in a change of law.  Smiths did not waive its right to challenge venue post-*TC Heartland* merely because it admitted in its 2012 Answer that venue was proper at that time.

### 2.  Smiths's 2012 Counterclaims Do Not Amount to Waiver

"[F]iling a counterclaim, compulsory or permissive, cannot waive" Rule 12 defenses, particularly when the moving party has not been "extensively participating in the litigation" before seeking timely dismissal of the case.[43]  Further, "the Federal Circuit has suggested that the [waiver] inquiry should at least start with an examination of the 'time from when the defense becomes available to when it is asserted.'"[44]

---

[41] *See, e.g., In re Micron*, 875 F.3d 1091; *Genesis Attachments LLC v. Detroit Edge Tool Co.*, 2019 WL 1924302 (W.D. Wis. Apr. 30, 2019); *Xodus Med.* 2018 WL 4385243.

[42] 908 F.3d at 1306.

[43] *Rates Technology Inc. v. Nortel Networks Corp.*, 399 F.3d 1302, 1308–09 (Fed. Cir. 2005); *see also Campbell v. Bartlett*, 975 F.2d 1569, 1574 (10th Cir. 1992) ("We follow the rule that by filing a compulsory counterclaim a party does not waive Rule 12(b) objections.").

[44] *Intellectual Ventures II LLC v. FedEx Corporation*, 2017 WL 5630023 at *3 (E.D. Texas, Nov. 22, 2017) (quoting *In re Micron*, 875 F.3d 1091, 1102 (Fed. Cir. 2017)).  The *Intellectual Ventures* Court refers to this as a "forfeiture"

Considering that a venue defense was unavailable when the case was filed, it was entirely appropriate that Smiths answered the Complaint and asserted counterclaims seeking affirmative relief, especially if those counterclaims were compulsory.[45]  Unlike jurisdictional defenses that are subject to waiver, seeking affirmative relief in counterclaims will not ordinarily implicate waiver of venue defenses—at least not here, where Smiths had no way of knowing patent venue law would change significantly years later while this case was administratively closed.  To find otherwise would place many parties in the untenable position of having to blindly weigh at the outset of litigation the potential value of claims that may be lost if not asserted against the risk that asserting those claims could result in waiver of new defenses that may later become available only as a result of unforeseen changes in the law.  Such an approach would impede rather than promote the orderly and efficient resolution of disputes.

Nevertheless, specific circumstances in individual cases may compel different results.  As appellate courts have counseled, this is particularly so where a new defense becomes available late in litigation.  But notwithstanding the 2012 filing date, this case remains procedurally in its infancy due to a nearly seven year stay during which the parties were engaged in proceedings relating to review of the relevant patents.[46]  Importantly, none of Smiths's counterclaims have been actively litigated.

---

inquiry, but Bard frames the issue as one sounding in waiver.  The two terms can be used interchangeably when considering whether a party's counterclaims defeat a subsequent improper venue motion.

[45] Dkt. 70.

[46] The length of the stay is reflected in the complex procedural history of this case.  During the *inter partes* reexamination of the patents at issue, the USPTO initially invalidated the challenged patents.  Bard appealed the decision to the Federal Circuit, which found in 2018 that the USPTO's claim construction was "unreasonably broad" and vacated and remanded the case.  On remand, the USPTO upheld the three challenged patents.  *See C.R. Bard v. AngioDynamics, Inc.*, No. 2:12-cv-35 (D. Utah) Dkt. 152 (Bard's Opposition to AngioDynamics's Initial Motion to Dismiss or Transfer for Improper Venue) at 3.

In light of these facts, the court declines to find waiver of its new venue defense based on Smiths's filing of counterclaims.[47]

## II. Smiths Did Not Have a Regular and Established Place of Business in the District of Utah When the Case Was Filed in 2012

### A. Background

Questions concerning regular and established places of business in venue disputes are often fact intensive. That is the case here. For this reason, the court provides first a detailed summary of the relevant facts existing in 2012 when this case was filed.

Smiths employed at the time this suit was filed in 2012 a team of sixteen sales representatives assigned to cover its Mountain State region, encompassing Arizona, Colorado, Nevada, Utah, and Wyoming.[48] Fourteen of the sales representatives periodically visited Utah on sales trips from their homes in other states. The remaining two, Claudia Campbell and Mike Franson, lived in Utah and serviced customers throughout the multi-state territory, including Utah.[49] When in Utah, the sales representatives worked in the field, visiting customers at hospitals, surgery centers, and other healthcare facilities, and sometimes performing product demonstrations at customers' places of business.[50]

Smiths's sales representatives typically did not place orders for customers in 2012. Rather, customers directly placed their own orders using an automated system through a Shared

---

[47] Other courts have reached a similar conclusion. *See, e.g., H.W.J. Designs for Agribusiness, Inc. v. Rethceif Enterprises*, LLC, 2018 WL 827768, at *4 (E.D. Cal. Feb. 12, 2018) (finding assertion of counterclaim did not waive venue challenge in patent case); *Rillito River Solar LLC v. Wencon Dev. Inc.*, 2017 WL 5598228, at *4 (D. Ariz. Nov. 21, 2017) (same); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1397 (3d ed. 2004) ("The trend in more recent cases is to hold that no Rule 12(b) defense is waived by the assertion of a counterclaim, whether permissive or compulsory.").

[48] *See* Dkt. 157-1 (De Leon Decl.) at ¶ 10; Dkt. 204-1, Ex. A (Supp. Responses) at 3–4.

[49] Dkt. 204-1, Ex. A at 3–4.

[50] Dkt. 157-1 at ¶¶ 10–12.

Services Center located outside Utah.[51]  In the rare event a sales representative did place a customer's order, they did so via telephone or facsimile through the same out-of-state Shared Services Center.[52]  Additionally, Smiths did not provide Utah-based administrative support to the sales representatives.[53]  Such support "would have been provided from Smiths Medical's corporate headquarters in Minnesota, its Shared Services Center in Dublin, Ohio, or, for product specific support, one of its other facilities located in Keene, New Hampshire or Southington, Connecticut."[54]

When not working in the field, the sales representatives worked from home offices performing administrative tasks, including preparing expense reports, making internal telephone calls, speaking with account managers, and scheduling meetings with customers.[55]  Although the sales representatives kept small amounts of Smiths marketing materials and products for demonstration purposes at their home offices, Smiths did not store product inventory at its sales representatives' homes or use the home offices as distribution centers.[56]  Sales representatives were reimbursed for home office-related expenses, including home phone lines, internet service, office supplies, and cell phones.[57]  Smiths did not own, lease, control, or occupy any portion of a sales representative's home or residence, nor did Smiths play any role in selecting any sales representatives' residence in Utah.[58]

---

[51] *Id.* at ¶ 11.

[52] *Id.*

[53] *Id.* 157-1 at ¶¶ 9–12.

[54] *Id.* 157-1 at ¶ 12.

[55] Dkt. 204-1, Ex. A at 10.

[56] Dkt. 157-1 at ¶ 10.

[57] *Id.* at ¶ 14.

[58] *Id.* at ¶ 9.

In 2012, the sales representatives assigned to Utah also had access to an unmarked, shared 10' x 20' storage unit located in Murray, Utah.  The unit was leased by a Smiths sales representative, who was reimbursed for the leasing cost by Smiths.[59]  It was used to store product samples, marketing literature, and heavier pieces of capital equipment.[60]  Smiths did not hold the storage unit out as a place of business, there was no Smiths signage on the unit, and it was not listed on any Smiths website or directory.[61]

While all sixteen sales representatives had the ability to access the storage unit, venue discovery revealed only eight of them potentially did so, with the frequency of use varying widely among them.[62]  The sales representatives retrieved sample products stored in the unit and transported them via company-issued vehicles to customers' places of business for presentations and product demonstrations.[63]  It was Smiths's company policy not to store any saleable inventory in nor distribute products from the storage unit, and none of the sales representatives transacted any business or met with customers at the unit.[64]

    1.  <u>Claudia Campbell's Activities in 2012</u>

Claudia Campbell lived in Utah and was a Smiths "Key Account Manager" when this action was filed in 2012.[65]  She was responsible for meeting with corporate buying teams for key accounts and for accompanying and providing support to other Smiths sales representatives

---

[59] *Id.* at ¶ 15.

[60] *Id.*

[61] *Id.*; Dkt. 206-4, Ex. F (De Leon Depo.) at 128:2–129:7.

[62] Dkt. 216-1 (Plaintiff's Opp. Memo.), Ex. 1 (Second Supp. Responses) at 14–15.

[63] Dkt. 157-1 at ¶ 15.

[64] Dkt. 216-1, Ex. 1 at 15.

[65] *Id.* at 5.

during meetings and demonstrations with customers.[66]  Campbell spent a typical work week

traveling and visiting out-of-state clients Tuesday through Thursday,[67] while using Mondays and

Fridays to call on Utah accounts or work from her home office.[68]  In 2012, Campbell did not

personally place orders for any of her Utah accounts, nor did she meet with any customers at her

home office.[69]

Campbell kept certain materials at her home office, including marketing materials,

support documentation, binders, and instructional manuals that fit within a double-wide file

drawer.[70]  She also had certain product samples in her home office that she took with her to

customers' places of business for demonstration purposes.[71]  These included Smiths's infusion

hardware, such as the "Medfusion™ pump and patient-controlled analgesia ("PCA") pump," and

several boxes of Smiths's consumable products.[72]  Campbell ordered additional product samples

from Smiths to be shipped to her home as needed.[73]

Campbell used the Utah storage unit to store larger quantities of product samples and

larger hardware.[74]  On average, she went to the unit once a month,[75] but she never met with

customers there.[76]  Campbell acknowledged that although it was Smiths's policy to not use

---

[66] *Id.*

[67] *Id.* at 7.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 6.

[71] *Id.*

[72] *Id.*

[73] *Id.* at 11–12.

[74] *Id.*

[75] *Id.* at 15.

[76] *Id.* at 7.

product from the storage unit to fulfill purchase orders, this could have happened "in an emergency situation involving a product backorder."[77]  But there is no evidence Campbell ever did this.[78]

2.   Mike Franson's Activities in 2012

When this case was filed, Mike Franson was a Distribution Manager responsible for relationships with national distributors.[79]  Although he lived in Utah, he did not have any Utah accounts in 2012 and spent very little time working in the state.[80]  Franson did not perform any demonstrations or make any sales calls in Utah, nor did he place any orders for Utah customers in 2012.[81]

Franson maintained a home office in Utah, where he typically worked on Mondays and Fridays performing administrative tasks.[82]  He traveled and visited customers outside Utah Tuesdays through Thursdays.[83]  At his home office, Franson kept a limited amount of marketing material and a few select sample products that were used only for demonstration purposes.[84]  If a customer needed samples, he ordered them for delivery to the customer's location.[85]  Franson never met customers at his home office,[86] and he did not use the Utah storage unit in 2012.[87]

---

[77] *Id.*

[78] Dkt. 223 (Defendant's Reply) at 5.

[79] Dkt. 216-1, Ex. 1 at 8.

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.* at 9.

[85] *Id.*

[86] *Id.* at 8.

[87] *Id.* at 15.

### B.  Legal Standard

The Federal Circuit announced in *In re Cray Inc.* a three-part test for determining whether venue is proper under the "regular and established place of business" prong of 28 U.S.C. § 1400(b)[88]: "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant. If any statutory requirement is not satisfied, venue is improper under § 1400(b)."[89]

When applying the three *Cray* factors, the Federal Circuit stresses that district courts "should be mindful of th[e] history in applying the statute and be careful not to conflate showings that may be sufficient for other purposes, *e.g.*, personal jurisdiction or the general venue statute, with the necessary showing to establish proper venue in patent cases."[90]  When Congress adopted the predecessor to § 1400(b) as a special patent venue statute, it did so "to eliminate the 'abuses engendered' by previous venue provisions allowing such suits to be brought in any district in which the defendant could be served."[91]  Therefore, the standard for determining a regular and established place of business "requires more than the minimum contacts necessary . . . for satisfying the doing business standard of the general venue

---

[88] Because Smiths is incorporated in Delaware, there is no dispute venue would be improper under only the residency prong of § 1400(b).  Therefore, Bard must show under the second prong that Smiths both committed acts of infringement in the District of Utah *and* has a regular and established place of business here.  Whether Smiths committed acts of infringement "is a factual question not appropriate for resolution on a motion to dismiss for improper venue." *Zaxcom, Inc. v. Lectrosonics, Inc.*, 2019 WL 418860 at *4 (E.D.N.Y. Feb. 1, 2019) (unpublished) (citing *Medicines Co. v. Hospira, Inc.*, 881 F.3d 1347, 1350 (Fed. Cir. 2018) ("Infringement is a question of fact."); *In re Cordis Corp.*, 769 F.2d 733, 737 (Fed. Cir. 1985) (The "issue of infringement" is "a question to be determined at trial" and "is not reached on the merits in considering venue requirements.")).  Smiths does not contest for purposes of its Motion Bard's allegations that it committed infringing acts in this district.

[89] *In re Cray Inc.*, 871 F.3d 1355, 1360 (Fed. Cir. 2017).  Federal Circuit law governs the interpretation of what constitutes a regular and established place of business.  "Section 1400(b) is unique to patent law, and constitutes the exclusive provision controlling venue in patent infringement proceedings . . . [t]hus, Federal Circuit law rather than regional circuit law, governs our analysis of what § 1400(b) requires." *Id.* (internal quotation marks and citation omitted).  *See also* discussion, *supra* note 26.

[90] *Id.* at 1361.

[91] *Id.* (citing *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 (1961)).

provision."[92]   The Federal Circuit further explained that "no precise rule has been laid down and each case depends on its own facts."[93]

### 1.   A Physical Place in the District

The defendant's "place" need not be "a fixed physical presence in the sense of a formal office or store," but it must still be "a physical, geographical location in the district from which the business of the defendant is carried out."[94]   Although Campbell's and Franson's homes and the Utah storage unit all fit the description of "a building" and thus, "a physical location," the statute requires more.   As *Cray* suggests, courts should consider how the home or storage unit is used by a defendant to conduct its business.[95]   This analysis overlaps in many respects with the elements considered under the third *Cray* factor.   To avoid repetition, the court will examine Smiths's 2012 business practices under the final *Cray* requirement discussed below.

### 2.   A Regular and Established Place of Business

A place of business may be "regular" if it operates in a "steady, uniform, orderly, and methodical manner."[96]   Sporadic activity is not enough to create venue.[97]   To be "established," the place of business cannot be transient; it must be "settled certainly, or fixed permanently."[98]   Concerning employees who work from home offices, "if an employee can move his or her home

---

[92] *Id.*

[93] *Id.* at 1362.

[94] *Id.* (internal quotation marks and citation omitted) (emphasis added).

[95] *Id.*

[96] *Id.* (citation and internal punctuation omitted).

[97] *Id.*

[98] *Id.* at 1363. (citation and internal punctuation omitted).

out of the district at his or her own instigation, without the approval of the defendant, that would cut against the employee's home being considered a place of business of the defendant."[99]

Here, Bard argues the homes of the Smiths sales representatives living in Utah in 2012 were "established" places of business because they were not in the district by happenstance. Bard contends it was Smiths's policy to "recruit in the markets that [it] wanted sales reps to live in."[100] And the business the representatives conducted in their home offices was "regular" because they performed their job functions there at least two days per week.[101] Similarly, the storage unit was used frequently by at least three sales representatives covering Utah.[102] The court finds this reasoning unpersuasive.

First, as Smiths explains, Utah was never a single-state territory.[103] In 2012, it was part of the Mountain State sales territory, which included four other states.[104] None of the sales representatives were required to live within a particular state, and of the sixteen sales representatives who covered Utah, only two lived here.[105] While it was Smiths's preference to hire sales representatives who lived within their assigned territory, they were allowed to live anywhere within the territory they serviced.[106] Additionally, the sales representatives were allowed to move their homes out of the district if they chose to do so, without prior approval

---

[99] *Id.*

[100] Dkt. 214 at 15; *see also* Dkt. 206-4, Ex. F at 59:11–12.

[101] Dkt. 214 at 15.

[102] *Id.* at 213–14.

[103] Dkt. 204 at 10.

[104] *Id.*; *see also* Dkt. 157-1 at ¶ 10; Dkt. 204-1, Ex. A at 3–4.

[105] Dkt. 204 at 10.

[106] *Id.*

from Smiths.[107]  As the *Cray* Court instructed, this fact cuts against finding the home offices to

be established places of business because they were not permanently fixed.

Second, although Campbell and Franson typically worked from their home offices on

Mondays and Fridays, they both spent the majority of their work week traveling and visiting

customers outside Utah.[108]  For his part, Franson neither had customer accounts in Utah nor did

he make any sales calls within the state during the entirety of 2012.[109]  The work he performed

for Smiths from his home office was directed entirely to customers outside Utah.  Bard has

provided no evidence showing Smiths controlled or arranged Campbell's or Franson's schedules

or dictated how often sales representatives were to work from their home offices.  Bard has

failed to establish that the work performed by Smiths sales representatives in Utah was "steady,

uniform, orderly, and methodical."

For similar reasons, the Utah storage unit cannot be considered a "regular" or

"established" place of business.  The use of storage units was not part of any uniform Smiths

program.[110]  At most, it was a convenience that some Smiths sales representatives chose to take

advantage of.  Individual sales representatives chose the storage unit's location, and they were

free to change that location anytime without Smiths's approval.[111]  They chose the storage

company, decided whether to enter a lease or pay monthly, and could discontinue the use of the

---

[107] *Id.*

[108] Dkt. 216-1, Ex. 1 at 7, 8.

[109] *Id.* at 8.

[110] Dkt. 204 at 11.

[111] *See* Dkt. 206-4, Ex. F at 21:2–27:5.

storage unit at any time.[112]  These facts weigh against finding the storage unit to be an established place of Smiths's business.

Further, Bard has provided no compelling evidence showing the storage unit was used in any orderly or methodical manner.  Although eight of Smiths's Utah sales representatives possibly used the storage unit, Bard can identify only three who may have used the unit with some frequency.[113]  Bard offers no specific dates, official records, or any other evidence showing the storage unit was used regularly.[114]  The court lacks sufficient evidence upon which to conclude that the storage unit was a regular and established place of business.  Bard has not established the second *Cray* factor necessary to establish venue in this District.

### 3.   The Place of the Defendant

A regular and established place of business must be the "place *of the defendant*, not solely a place of the defendant's employee."[115]  The place must be ratified or established by the defendant.  It is not sufficient for the employee to do so on their own.[116]  The Federal Circuit identifies several considerations for trial courts evaluating the "place of the defendant" factor, including: (1) whether the defendant owns, leases, or exercises control over the place; (2) whether the defendant conditioned employment on the continued residence of the employee in the district; (3) whether the defendant stored materials at the place in the district for sale or distribution; (4) whether the defendant used marketing or advertising to indicate that the physical location was its place of business; and (5) how the defendant's alleged place of business in the

---

[112] *Id.*; Dkt. 223 (Defendant's Reply) at 6.

[113] *See* Dkt. 216-1, Ex. 1 at 15.

[114] *See* Dkt. 214 at 14–16.

[115] *Cray*, 871 F.3d at 1363 (emphasis in original).

[116] *Id.*

district compares with other places of business of the defendant in other venues.[117]  The court evaluates each consideration in turn.

(a) Ownership and Control

(1) Campbell's and Franson's Home Offices

Smiths did not own, lease, or otherwise control any portion of Campbell's or Franson's homes in 2012, nor did Smiths participate in selecting its sales representatives' homes.[118] Although it is Smiths's policy to provide their sales representatives with computers and cell phones and to reimburse them for office supplies, internet service, and home phone lines, this is not enough to render a sales representative's home office a place of Smiths.[119]  Such expenditures are not "intentional actions" directed at creating a regular and established place of business within a district, but are instead used to support sales representatives who cover broad areas.[120] To illustrate, the *Cray* defendant provided similar materials and reimbursements, but the Federal Circuit nonetheless found venue improper despite such arrangements.[121]  As the court explained, the patent venue statute "clearly requires" more than merely showing "the defendant's employee owns a home in which he carries on some of the work that he does for the defendant."[122]

---

[117] *Id.* at 1363–64.

[118] Dkt. 204 at 12.

[119] *Id.*

[120] *Free-Flow Packaging Int'l, Inc. v. Automated Packaging Sys., Inc.*, 2017 WL 4155347, at *6 (N.D. Cal. Aug. 29, 2017) (unpublished).

[121] *Cray*, 871 F.3d at 1364–65.

[122] *Id.* at 1365 (citation omitted); *see also Regents of Univ. of Minnesota v. Gilead Scis., Inc.*, 299 F. Supp. 3d 1034, 1043–44 (D. Minn. 2017) (providing computers and reimbursing home office expenses was insufficient to establish a place of the defendant); *Zaxcom*, 2019 WL 418860 at *5 (same).

(2) Utah Storage Unit

Similarly, Smiths did not directly own, lease, or control the Utah storage unit used by its sales representatives.[123]  The unit was leased through a third party, and Smiths reimbursed the expense to the sales representative who leased it.[124]  Smiths did not manage the products stored there nor did it require sales representatives to use the storage unit.[125]  Simply reimbursing the cost of the unit is not enough to establish it as a place of Smiths.[126]

Bard contends the storage unit is similar to the lockers at issue in *Rensselaer Polytechnic Inst. v. Amazon.com, Inc.*, where the court found the lockers represented a regular and established place of business of the defendant.[127]  There, defendant Amazon used large, metal lockers on third-party premises as places where customers could retrieve or drop off packages.[128]  Amazon operated and maintained the lockers, which were branded with Amazon's logo and customer service number, and Amazon promoted the lockers to the public as a secure place to conduct customer transactions.[129]  Bard argues that Smiths used the storage unit in this case in a similar manner to carry out the objective of its business.

---

[123] Dkt. 204 at 16.

[124] *Id.*

[125] *Id.*

[126] *See also Regents*, 299 F. Supp. 3d at 1043 (finding offsite storage lockers leased through a third party and containing a small amount of defendant's products did not constitute a place of the defendant); *Zaxcom*, 2019 WL 418860 at *5 (holding no place of defendant where employee leased a UPS mailbox to receive packages of defendant's products and was reimbursed for the cost by defendant); *Free-Flow Packaging*, 2017 WL 4155347 at *2, 6 (venue improper where defendant reimbursed employee for storage unit where he kept defendant's products used for samples and demonstration purposes).

[127] 2019 WL 3755446, at *14 (N.D.N.Y. Aug. 7, 2019) (unpublished).

[128] *Id.* at *3.

[129] *Id.*

The evidence before the court is to the contrary.  Unlike the *Rensselaer* defendant, Smiths never held the storage unit out to the public as a place of business, and Smiths sales representatives conducted no meetings nor customer transactions at the unit.  And while the *Rensselaer* Court found Amazon's degree of control over the lockers established a place of business of the defendant, Smiths did not control the storage unit in a similar manner.  The storage unit was not a Smiths place of business.

(b) Condition of Employment

As explained above under the second *Cray* factor analysis, Smiths did not condition employment on the location of a sales representative's home in Utah.  Bard nevertheless contends that the presence of Utah-based sales representatives—notably Campbell as a Key Account Manager—was particularly important to Smiths's business.[130]  Campbell handled Smiths's largest and most important acute hospital accounts in the territory, three of which were in Utah.[131]  But these facts do not suggest Campbell was required to live in Utah to carry out her duties.  As Smiths points out, Campbell oversaw key accounts in four other states, and it was not critical to her job (nor possible) that she live in the state where each key account was located.[132]

Bard further argues that the administrative work Campbell performed in her home office was more executive in nature than sales related, and therefore, more important to Smiths's business.[133]  Campbell was responsible for strategic growth planning, sales forecasting, goal setting, and marshalling Smiths's resources.[134]  But while Campbell may have been a key

---

[130] Dkt. 214 at 4, 15.

[131] *Id.* at 4.

[132] Dkt. 223 at 3.

[133] Dkt. 214 at 4.

[134] *Id.*

member of the Smiths's sales team, that does not change the controlling analysis.  The facts in *Cray* were similar, where the two employees in question were also high-level staff members in the defendant's business.  One of the employees was a "senior territory manager," while the other was a "sales executive" responsible for sales "in excess of $345 million."[135]  The court explained that even if the employees performed work for the defendant beyond sales, including "management of key accounts," it would not change the analysis under the *Cray* factors.[136]

Bard's suggestion that the court separately consider the nature and relative importance of the tasks performed by each sales representative in the District is an invitation to add a new element to the third *Cray* factor.  This court will not do, especially where the Federal Circuit cautioned against such an approach when it decided *Cray*, stating, "[W]e do not suggest that district courts must scrutinize the 'nature and activity' of the alleged place of business to make relative value judgments on the different types of business activity conducted therein."[137]  Bard has not established that Campbell's home office was Smiths's place of business simply because the work she performed there was executive in nature.

(c) <u>Storage of Materials</u>

In contrast, that Campbell and Franson stored Smiths's products in their home offices and a significant number of products were also kept in the storage unit weighs in favor of finding one or more of these a place of business for Smiths.[138]  It was an important part of Smiths's business to have sales representatives carry products in their sales bags and vehicles so they were on hand

---

[135] *Cray*, 871 F.3d at 1357.

[136] *Id.* at 1366.

[137] *Id.* at 1364, n.*.

[138] *See Zaxcom*, 2019 WL 418860 at *6 (finding this factor in favor of plaintiff when employee kept a significant number of defendant's products in his home and garage).

for demonstrations while out on sales calls.[139]  Many of Smiths's products are consumable, one-time use items, and sales representatives frequently provided multiple samples to customers.[140]  Thus, it was necessary for sales representatives to keep products in their homes and helpful to utilize a storage unit for larger quantities of sample products and larger pieces of capital equipment.[141]

Although the products stored in the home offices and the storage unit were nonsaleable inventory, the volume of stored products was notable.  For example, over a six-month period in 2012, Campbell shipped to her home approximately 12,300 sample products.[142]  The products were small, consumable items, such as needles and syringes, but they are indicative of the volume of products stored by Smiths's sales representatives.  This is in contrast with *Cray*, where the sales representatives in question did not store any products or marketing materials in their homes.[143]

An important consideration is whether the stored products were ever directly sold or distributed to customers.  For example, in *In re Cordis Corp.*, the Federal Circuit held venue was proper where a defendant not only used its employees' homes to store its "literature, documents, and products," but also treated the homes as distribution centers, where inventory was stored and

---

[139] Dkt. 204 at 13.

[140] *See* Dkt. 216-1, Ex. 1 at 6 (Regarding consumable products, Campbell usually took five to ten samples of each given product to a demonstration for clients.).

[141] *Id.* at 6–7.

[142] Dkt. 214 at 4; Dkt. 216-1, Ex. 1 at 11–12.

[143] 871 F.3d at 1365.  *See also RegenLab USA LLC v. Estar Techs. Ltd.*, 335 F. Supp. 3d 526, 552 (S.D.N.Y. 2018) (facts regarding inventory storage at employees' home offices cut in favor of finding venue appropriate where employees used those products to conduct demonstrations for customers). But *cf. Automated Packaging Sys., Inc. v. Free-Flow Packaging Int'l, Inc.*, 2018 WL 400326, at *8 (N.D. Ohio Jan. 12, 2018) (finding venue improper where "small amounts of product are maintained in [employees'] homes, [but] this product is not available for direct sale to customers").

then taken directly to customers by the employees.[144]  Although Smiths's documents and sample products were kept in the sales representatives' homes and the storage unit, the products were for demonstration purposes only.[145]

Bard makes much of Campbell's statement that "in an emergency situation involving a product backorder," product from the storage unit may have been used to fulfill a purchase order.[146]  But Campbell acknowledged this practice was contrary to Smiths's policy.[147]  Even then, Bard has provided no evidence this ever happened.  Bard has also failed to produce evidence showing Smiths treated the sales representatives' home offices and the storage unit as inventory deposits or distribution centers.

### (d) Outward Representations Concerning the Alleged Places of Business

When determining whether a defendant has represented to the public that it has a place of business in the district, courts must consider whether the defendant listed the alleged place of business on a website, telephone or other directory, or placed its "name on a sign associated with or on the building itself."[148]  Smiths did not hold out the storage unit, Campbell's home, or Franson's home as places of business for the company.  The three locations were never listed on Smiths's website or any company directory,[149] and the sales representatives' business cards displayed the Ohio address and telephone number of Smiths's Shared Services Center.[150]

---

[144] 769 F.2d 733, 735 (Fed. Cir. 1985).

[145] Dkt. 206-4, Ex. F at 81:12–83:9, 81:18–82:22.

[146] Dkt. 216-1, Ex. 1 at 7.

[147] *Id.*

[148] *Cray*, 871 F.3d at 1363–64.

[149] Dkt. 204 at 14.

[150] *Id.*

While the business cards also included the Smiths-issued, Utah cellphone numbers for Campbell and Franson,[151] this is insufficient to establish a place of Smiths in the district.[152]  At most, the inclusion of the personal phone numbers indicated that Campbell and Franson conducted business from Utah, not that Smiths established a place of business in the state.[153]  Indeed, it is an antiquated notion that a personal cell phone number indicates establishment of a fixed address in a specific area.  In the modern era, people do not have to change their cell phone numbers every time they move or cross state lines, and the area code of a cell phone number only indicates where the number was initially issued.  It no longer creates a permanent link to a specific geographic location.

Further, there was no Smiths signage in front of or affixed to Campbell's or Franson's homes indicating they were places of business of Smiths.  Nor was there any Smiths signage on the storage unit.  In short, "nothing outwardly conveys" that the sales representatives' homes or the unmarked storage unit were places of Smiths's business.[154]

(e) Comparison of the Alleged Place of Business to Others

The final consideration relates to how the alleged places of business in the district compare to other places of business of the defendant in other venues.[155]  The purpose is to reveal, for example, whether the "defendant has a business model whereby many employees' homes are

---

[151] *Id.*

[152] *See Cray*, 871 F.3d at 1364–66 (employee's use of an in-district telephone number was not enough to establish a place of business for defendant); *Regents*, 299 F. Supp. 3d at 1045 (same); *Zaxcom*, 2019 WL 418860 at *6 (same).

[153] *Cray*, 871 F.3d at 1365–66.

[154] *Regents*, 299 F. Supp. 3d at 1045.

[155] *Cray*, 871 F.3d at 1364.

used by the business as a place of business by the defendant."[156]  There is no evidence of this here.  Smiths's business model does not contemplate all employees working from home, and for those who do, Smiths does not treat their home offices as places of business.[157]

Telecommuting and the use of home offices has clearly risen significantly over the past fifteen years.  This was the case even before changes this year wrought by the COVID-19 global pandemic.  Arguments that home offices amount to established places of business for corporate defendants are far less persuasive in the modern era.  If the court were to find venue established here, then virtually every business where an employee works from home could be subject to venue wherever those home offices are located.  This would render the "regular and established place of business" prong of § 1400(b) all but meaningless.  As the *Cray* Court explained, "[I]t is of no moment that an employee may permanently reside at a place or intend to conduct … business from that place for present and future employers.  The statute clearly requires that venue be laid where the defendant has a regular and established place of business, not where the defendant's employee owns a home" where some of the employee's work is carried out.[158]

When determining whether a defendant has a "regular and established place of business" within the District under § 1400(b), "no one fact is controlling."[159]  Considering the record as a whole, in view of the history and "restrictive" nature of the patent venue statute,[160] the court must

---

[156] *Id.* at n.*; *see also RegenLab USA LLC*, 335 F. Supp. 3d at 549 (observing that because all employees of the defendant worked from home, their home offices constituted a primary physical location for the defendant's business).

[157] Dkt. 204 at 18.

[158] *Cray*, 871 F.3d at 1365 (internal quotation marks and citation omitted).

[159] *Cray*, 871 F.3d at 1366.

[160] *See Stonite Prods. Co. v. Melvin Lloyd Co.*, 315 U.S. 561, 566 (1942).

conclude that Smiths had no regular and established place of business in the District of Utah when this case was filed in 2012.

### III.       This Case Should Be Transferred to the District of Delaware

If venue is found lacking, the court under 28 U.S.C. § 1406 may "in the interest of justice, transfer [the] case to any district or division in which it could have been brought." Smiths is incorporated, and therefore, resides in Delaware for purposes of 28 U.S.C. § 1400.  As this case could properly have been brought in Delaware, transfer to the District of Delaware is appropriate under § 1406.

Because Smiths's corporate headquarters and principal place of business are located in Minnesota, Smiths asks the court to transfer instead to the District of Minnesota for the sake of convenience.[161]  While the court acknowledges it would be more convenient for Smiths to litigate this case near its headquarters, it is Bard's right as plaintiff to choose where to bring its lawsuit.[162]  Bard requested transfer to the District of Delaware, an appropriate forum, and the court will honor that choice.

---

[161] Dkt. 204 at 23.

[162] "After all, the general rule says the plaintiff is the master of her complaint and gets to choose where and how to sue."  *K.B. by & through Qassis v. Methodist Healthcare – Memphis Hosps.*, 929 F.3d 795, 799 (6th Cir. 2019) (citing *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("The party who brings a suit is master to decide what law he will rely upon.")).

**CONCLUSION**

For the reasons explained above, Smiths's Renewed Motion to Transfer for Improper Venue is GRANTED.[163]  The Clerk of Court is directed to transfer the case to the United States District Court for the District of Delaware.

SO ORDERED this 16th day of November 2020.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge

---

[163] Dkt. 204.